## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MICHAEL CARTER, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiff,

    v.

TELARIA, INC., PAUL CAINE, MARK
ZAGORSKI, DOUG KNOPPER, RACHEL
LAM, WARREN LEE, JAMES
ROSSMAN, ROBERT SCHECHTER and
KEVIN THOMPSON,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:20-cv-01576

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND
20(a) OF THE SECURITIES
EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Michael Carter ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Telaria, Inc. ("Telaria" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Telaria, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Telaria and The Rubicon Project, Inc. ("Rubicon").

2.     On December 19, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand

to receive 1.082 shares of Rubicon common stock for each share of Telaria stock they own (the "Merger Consideration"). Upon completion of the merger, Telaria shareholders will own approximately 47.1% and Rubicon shareholders will own approximately 52.9% of the common stock outstanding.

3.    On January 30, 2020, in order to convince Telaria shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 (the "S-4") Registration Statement with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading S-4 violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act. On February 7, 2020, the Company filed a Form S-4/A Registration Statement (the "S-4/A") that did not correct the materially incomplete and misleading nature of the S-4. The Board has scheduled a special meeting of the Company's shareholders on March 30, 2020 to vote on the Proposed Transaction.

4.    While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4/A, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4/A materially incomplete and misleading.

5.    In particular, the S-4/A contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Telaria shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Telaria's financial

advisor, RBC Capital Markets, LLC ("RBC") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.    It is imperative that the material information that has been omitted from the S-4/A is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Telaria shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Telaria maintains its principal executive offices in this District.

## PARTIES

11.    Plaintiff is, and at all relevant times has been, a holder of Telaria common stock.

12.    Defendant Telaria is incorporated in Delaware and maintains its principal executive offices at 222 Broadway, 16th Floor, New York, NY 10038. The Company's common stock trades on the NYSE under the ticker symbol "TLRA."

13.    Individual Defendant Paul Caine is Telaria's Chairman and has been a director of Telaria at all relevant times.

14.    Individual Defendant Mark Zagorski is Telaria's Chief Executive Officer and has been a director of Telaria at all relevant times.

15.    Individual Defendant Doug Knopper has been a director of Telaria at all relevant times.

16.    Individual Defendant Rachel Lam has been a director of Telaria at all relevant times.

17.    Individual Defendant Warren Lee has been a director of Telaria at all relevant times.

18.    Individual Defendant James Rossman has been a director of Telaria at all relevant times.

19.    Individual Defendant Robert Schechter has been a director of Telaria at all relevant times.

20.     Individual Defendant Kevin Thompson has been a director of Telaria at all relevant times.

21.     The Individual Defendants referred to in paragraphs 13-20 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Telaria (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of January 30, 2020, there were approximately 57,000,000 shares of Telaria common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of Telaria will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

iii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4/A.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.    The Proposed Transaction**

24.    Telaria provides a fully programmatic software platform for publishers to manage and monetize their video advertising, built specifically for digital video and to support the requirements of connected TV, mobile and over the top content. The Company provides publishers with real time analytics, data and decisioning tools to control their video advertising business and provide solutions to optimize yield across a publisher's supply of digital video inventory.

25.    On December 19, 2019, Telaria and Rubicon issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> LOS ANGELES & NEW YORK--(BUSINESS WIRE)--Rubicon Project (NYSE:RUBI), the global exchange for advertising, and Telaria (NYSE: TLRA), the complete software platform that optimizes yield for leading video publishers, announced today that they have entered into a definitive agreement to combine in a stock-for-stock merger. The transaction, which has been unanimously approved by the Boards of Directors of both companies, will create the world's largest independent sell-side advertising platform, poised to capture growth in CTV.
>
> Together, Rubicon Project and Telaria will enable thousands of publishers to connect with hundreds of buyers and brands, creating a global, independent alternative to closed players in the ecosystem. In addition, the combined company will be an essential omnichannel partner for buyers across formats, screens and geographies. Both companies bring premium publisher partnerships and unique technical capabilities: Telaria as a leader in CTV, and Rubicon Project as an expert in scaled programmatic operations.
>
> "The combination of Rubicon Project and Telaria will establish the world's largest, independent sell-side advertising platform with scale, capabilities and solutions unmatched by the competition," said Michael Barrett, President & CEO of Rubicon Project. "This transformative combination builds on our commitment to trust and transparency and accelerates our strategy to provide buyers and sellers with a single path to every format and channel including CTV. We could not be more excited about the future as two individually strong industry leaders with complementary assets and cultures come together to create a market leader that we believe will generate significant opportunities for our employees, customers, partners, and stockholders worldwide."
>
> "Our businesses are highly complementary, and when combined, are a powerful,

strategic alternative to the walled gardens, which have been frustrating both buyers and sellers due to their lack of transparency, innovation bottlenecks, and conflicted business models," stated Telaria CEO, Mark Zagorski. "The two companies will provide more technology resources, a broader geographic footprint and deeper financial assets to attack the growing opportunity created by the shift from linear viewing to CTV to the benefit of our customers and in support of a thriving open internet. For our stockholders, we believe this merger allows us to accelerate our growth, while providing additional resources to increase investment and continue to scale our industry-leading CTV technology. For our employees, this is an opportunity for development and to fully realize the potential of what we have built these past few years in a scaled, omnichannel platform."

**Strategic Rationale and Financial Benefits**

The World's Largest Independent Sell-Side Advertising Platform: The combination of Rubicon Project's programmatic scale and expertise with Telaria's leadership in CTV technology and premium partnerships, will create the world's largest independent sell-side advertising platform. The result will enable publishers to monetize across all auction types and formats including CTV, desktop display, video, audio, and mobile. Together, the combined company will offer publishers a transparent alternative that supports the open internet and provides more control over how they manage their businesses.

Positioned to Capture the Growing CTV Opportunity: CTV is the fastest-growing digital medium, and an increasing amount of CTV viewing is ad-supported. CTV offers advertisers the premium environment of television and the enhanced marketing capabilities of digital media. As with all digital media, CTV advertising is poised to be almost entirely programmatically transacted in the near future. Driven by Telaria's leading market position and technology expertise, the combination of the two companies will provide additional engineering and sales resources, a broader geographic footprint and deeper financial assets to seize the CTV opportunity -- to the benefit of our customers and in support of a thriving open internet.

An Essential Omnichannel Partner for Buyers: The combination of Rubicon Project and Telaria will create an essential omnichannel partner for buyers to reach their target audiences, across all formats and devices, anywhere in the world. The result will be an optimized supply path across CTV, desktop display, video, audio, and mobile, committed to exceptional client service, industry-leading transparency, robust support for identity solutions and brand-safe, fraud-free premium inventory.

Uniquely Positioned to Serve Global Publishers: Rubicon Project and Telaria have complementary domestic and international footprints with strengths across the Americas, EMEA and APAC. In North America, the combined company will have strong technology and operations based in Los Angeles, New York and Silicon Valley. Together, the global company will have offices in 11 countries with trusted

relationships with the world's leading buyers and sellers.

<u>Combining Similar Cultures</u>: Combined, Rubicon Project and Telaria will have more than 600 employees and contractors in 19 cities. Both companies are proud of their strong, employee-centric, client-focused corporate cultures. Rubicon Project and Telaria each recognize its employees are the most significant contributors to its success, and will work to preserve and enhance that commitment as a combined entity.

<u>Stronger Combined Financial Profile</u>: The combined company will have diversified revenue streams, substantial Adjusted EBITDA and a strong balance sheet with approximately $150 million in cash and no debt based on September 30, 2019 balances. The merger creates both revenue and cost synergies, with expected annual run rate cost synergies of approximately $15-20 million. Lastly, we expect that the combined company will have substantial operating leverage resulting in attractive Adjusted EBITDA margins.

**Transaction Details**

Under the terms of the merger agreement, each share of Telaria common stock issued and outstanding as of the effective time of the Merger will be converted into the right to receive 1.082 shares of Rubicon Project common stock (and, if applicable, cash in lieu of fractional shares) less any applicable withholding taxes.

Upon closing, Telaria stockholders are expected to own approximately 47.1% and Rubicon Project stockholders are expected to own approximately 52.9% of the fully diluted shares of the combined company.

**Governance and Leadership**

Upon closing, Michael Barrett will be named Chief Executive Officer of the combined company, Mark Zagorski will be named President & Chief Operating Officer and David Day will be the Chief Financial Officer. Telaria board member Paul Caine will be Chairperson of the Board of Directors of the combined company. The full board will consist of nine members; four existing directors from each company and Michael Barrett, CEO.

**Timing and Approvals**

The transaction, which is expected to close in the first half of 2020, is subject to the receipt of required regulatory approvals and other customary closing conditions and the approval of stockholders of both companies.

**Advisors**

LUMA Partners LLC and Needham & Company, LLC are serving as financial

advisors to Rubicon Project, and Gibson, Dunn & Crutcher LLP is serving as its legal advisor. RBC Capital Markets, LLC is serving as financial advisor to Telaria, and Cooley LLP is serving as its legal advisor.

**Conference Call and Webcast**

Rubicon Project and Telaria will host a conference call today, December 19th at 8:00 a.m. ET to discuss the transaction. Callers may access the conference call via the investor relations page of each company's website at http://investor.rubiconproject.com/ and https://investor.telaria.com/; or callers in North America may dial 1-844-875-6911 and callers outside North America may dial 1-412-902-6511. A replay of the call will be archived on the companies' websites and available until January 2, 2020 via phone replay at 1-877-344-7529 or 1-412-317-0088 using access code 10137677.

**About Rubicon Project**

Founded in 2007, Rubicon Project is one of the world's largest advertising exchanges. The company helps websites and apps thrive by giving them tools and expertise to sell ads easily and safely. In addition, the world's leading agencies and brands rely on Rubicon Project's technology to execute billions of advertising transactions each month. Rubicon Project is an independent, publicly traded company (NYSE:RUBI) headquartered in Los Angeles, California.

**About Telaria**

Telaria (NYSE:TLRA) powers the future of TV advertising with proprietary, programmatic software that optimizes ad yield for leading video publishers across desktop, mobile and CTV. Telaria's clients include the most innovative video content publishers across the globe such as Hulu, SlingTV, PlutoTV, TubiTV, Singtel, Australia's Nine Entertainment Co, Network 10 and Seven West Media, and Brazil's Globo.

Telaria is headquartered in New York City and supports its global client base out of 13 offices worldwide across North America, EMEA, LATAM and APAC.

26.     Telaria is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the S-4/A, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for

themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

27.    If the false and/or misleading S-4/A is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.    The Materially Incomplete and Misleading S-4/A

28.    On January 30, 2020, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act. On February 7, 2020, the Company filed the S-4/A that did not correct the materially incomplete and misleading nature of the S-4.

### *The Materiality of Financial Projections*

29.    A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses that "[i]n connection with evaluating a possible transaction with Rubicon Project . . . Telaria's management provided to the Telaria board certain unaudited prospective financial information for the calendar years 2019 through 2023, which forecasts were extrapolated for calendar years 2024 through 2029." S-4/A 89.

30.    Additionally, "Telaria management received the Rubicon Project forecasts for calendar years 2019 through 2023 . . . from Rubicon Project management, and provided such Rubicon Project forecasts to the Telaria board and RBC Capital Markets, which Rubicon Project forecasts also were extrapolated for calendar years 2024 through 2029." *Id.*

31.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101). Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions. In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K. *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

32.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

33.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial*

*results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

34.    Here, Telaria's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it. S-4/A 64, 69.

35.    As discussed further below, the non-GAAP financial projections used do not provide Telaria's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### The Financial Projections Relied on by the Board

36.    The S-4 discloses that "[i]n connection with evaluating a possible transaction with Rubicon Project . . . Telaria's management provided to the Telaria board certain unaudited prospective financial information for the calendar years 2019 through 2023, which forecasts were extrapolated for calendar years 2024 through 2029." *Id.* at 89.  The Company's management also extrapolated financial information for Rubicon on a stand-alone basis that was provided to the Board and RBC.  *Id.*

37.    The S-4/A goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2029 for

Telaria: (1) Adjusted EBITDA and (2) Unlevered Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 92. Additionally, the S-4/A discloses forecasted values for projected non-GAAP financial metrics for 2020 through 2029 for Rubicon: (1) Adjusted EBITDA and (2) Unlevered Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 92-93.

38.     The S-4/A defines Adjusted EBITDA as "net income (loss) from continuing operations, before depreciation and amortization expense, total interest and other income (expense), net and (benefit) provision for income taxes, and as adjusted to eliminate the impact of non-cash stock-based compensation expense, expenses for prior corporate facilities required to be recorded as operating expenses as a result of the adoption of certain accounting standards, acquisition-related costs and executive severance, retention and recruiting costs." *Id.* at 91. Nevertheless, the S-4/A fails to reconcile Adjusted EBITDA to its most comparable GAAP measure or disclose the line items used to calculate Adjusted EBITDA, rendering the S-4/A materially false and/or misleading. *Id.*

39.     The S-4/A defines Unlevered Free Cash Flow ("UFCF") as "Adjusted EBITDA less stock-based compensation, a 25% cash tax expense, and capital expenditures, plus decreases (or less increases) in working capital." *Id.* at 92 n.4. Nevertheless, the S-4/A fails to reconcile UFCF to its most comparable GAAP measure or disclose the line items used to calculate UFCF, rendering the S-4/A materially false and/or misleading. *Id.*

40.     Thus, the S-4/A's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects

and the inputs and assumptions for which those prospects are based upon. It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

41.    The non-GAAP financial projections disclosed on pages 92-93 of the S-4/A violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

42.    As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### *The Financial Projections Violate Regulation G*

43.    The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure. 17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

measures."[3]

44.    Defendants must comply with Regulation G.  More specifically, the Company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

45.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]   Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Telaria included in the S-4/A here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices

---

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com /2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

*which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

46.    The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

---

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.    The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP

47.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4/A into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

48.    In addition to the S-4/A's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

49.    Such projections are necessary to make the non-GAAP projections included in the S-4/A not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that "Adjusted EBITDA has limitations as an analytical tool, and should not be considered in isolation or as a substitute for analysis of Telaria's results of operations as reported under GAAP."  S-4/A 91.

50.    As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

---

financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Oct. 28, 2019).

51.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 92-93, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### The Materially Misleading Financial Analyses

52.     The summary of the valuation methodologies utilized by RBC, including the utilization of certain of the non-GAAP financial projections described above by RBC, in connection with its valuation analyses (*id.* at 81) is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once an S-4/A discloses internal projections relied upon by the Board, those projections must be complete and accurate.

53.     With respect to RBC's fairness opinion generally, the S-4/A only discloses one financial analysis (a discounted cash flow analysis for Telaria and for Rubicon). This is in contrast to Rubicon's financial advisor's fairness opinion summary which discloses a comparable companies analysis, comparable transaction analysis and a premium analysis in addition to discounted cash flow analyses. *Id.* at 73-76. Presumably RBC performed these analyses, and the failure to disclose these fundamental valuation analyses materially affects shareholders' ability to determine the value of the Company. In the event RBC did not perform additional valuation analyses, the S-4/A must disclose why not.

54.     With respect to RBC's *Discounted Cash Flow Analyses*, the S-4/A states that RBC performed the analysis on both Telaria and Rubicon. *Id.* at 83. With respect to valuing Telaria, RBC calculated the estimated present value of the standalone unlevered, after-tax free cash flows that Telaria was forecasted to generate during the fiscal years ending December 31, 2020 through December 31, 2029 based on the financial projections and other estimates from Telaria

management. *Id.* To calculate the terminal value, RBC applied a perpetuity growth rate range of 3% to 4% to Telaria's unlevered free cash flow for the terminal year. To calculate the present values, RBC applied a discount rate range of 10.0% to 12.5%. *Id.* RBC treated stock-based compensation as a cash expense and the utilization of net operating loss carryforwards during the forecast period was taken into account. *Id.*

55.     With respect to valuing Rubicon, RBC calculated the estimated present value of the standalone unlevered, after-tax free cash flows that Rubicon was forecasted to generate during the fiscal years ending December 31, 2020 through December 31, 2029 based on Rubicon's financial projections and Telaria management's extrapolations of the Rubicon financial projections. *Id.* at 84. To calculate the terminal value, RBC applied a perpetuity growth rate range of 3.0% to 4.0% to Rubicon's unlevered free cash flow for the terminal year. To calculate the present values, RBC applied a discount rate range of 12.5% to 15.0%. *Id.* RBC treated stock-based compensation as a cash expense and the utilization of net operating loss carryforwards during the forecast period was taken into account. *Id.*

56.     With respect to RBC's discounted cash flow analysis of Telaria, the S-4/A does not disclose the calculated range of terminal values, the inputs and assumptions that went into the selection of the perpetuity growth rate range, whether or not RBC used the cost of equity or the weighted average cost of capital in its analysis, any of the inputs that went into calculating the Company's discount rate range, the Company's forecasted stock-based compensation and net operating loss carryforwards, whether any enterprise adjustments were made or the number of fully diluted shares outstanding of Telaria.

57.     With respect to RBC's discounted cash flow analysis of Rubicon, the S-4/A does not disclose the calculated range of terminal values, the inputs and assumptions that went into the

selection of the perpetuity growth rate range, whether or not RBC used the cost of equity or the weighted average cost of capital in its analysis, any of the inputs that went into calculating Rubicon's discount rate range, Rubicon's forecasted stock-based compensation and net operating loss carryforwards, whether any enterprise adjustments were made or the number of fully diluted shares outstanding of Rubicon.

58.    Since information was omitted, shareholders are unable to discern the veracity of RBC's discounted cash flow analyses. Without further disclosure, shareholders are unable to compare RBC's calculations with the Company's financial projections. The absence of any single piece of the above information renders RBC's discounted cash flow analyses incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

59.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id.* (footnote omitted). As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

60.     Therefore, in order for Telaria shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

61.     In sum, the S-4/A independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4/A independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4/A to garner votes in support of the Proposed Transaction from Telaria shareholders.

62.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

63.     Further, failure to remedy the deficient S-4/A and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

64.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

65.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4/A] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

66.    As set forth above, the S-4/A omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure. 17 C.F.R. § 244.100(a).

67.    The failure to reconcile the non-GAAP financial measures included in the S-4/A violates Regulation G and constitutes a violation of Section 14(a).

68.    As a direct and proximate result of the dissemination of the false and/or misleading S-4/A Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

69.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

71.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

72.    Defendants have issued the S-4/A with the intention of soliciting shareholder support for the Proposed Transaction.   Each of the Defendants reviewed and authorized the dissemination of the S-4/A, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

73.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).   The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the S-4/A but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

74.    The Individual Defendants knew or were negligent in not knowing that the S-4/A is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

75.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4/A, rendering the sections of the S-4/A identified above to be materially incomplete and misleading.

76.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4/A.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4/A or failing to notice the material omissions in the S-4/A upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

77.    Telaria is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4/A.

78.    The misrepresentations and omissions in the S-4/A are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

79.     As a direct and proximate result of the dissemination of the false and/or misleading S-4/A Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

### COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

80.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

81.     The Individual Defendants acted as controlling persons of Telaria within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Telaria, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4/A filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

82.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4/A and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The S-4/A at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the S-4/A.

84.    In addition, as the S-4/A sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4/A purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

85.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

86.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding

with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4/A;

      C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

      D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  February 21, 2020

                                          Respectfully submitted,

                                          **FARUQI & FARUQI, LLP**

                                          By: *_/s/ James M. Wilson, Jr._*

                                          Nadeem Faruqi
                                          James M. Wilson, Jr.
                                          685 Third Avenue, 26th Floor
                                          New York, NY 10017
                                          Tel.: (212) 983-9330
                                          Fax: (212) 983-9331
                                          Email: nfaruqi@faruqilaw.com
                                                         jwilson@faruqilaw.com

                                          *Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Michael Carter ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed a draft complaint against Telaria, Inc. ("Telaria") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2. Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3. Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. Plaintiff's transactions in Telaria securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6. In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 20th day of February, 2020.

Michael Carter

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 03/15/19 | 500 |
|  |  |  |
|  |  |  |